IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

| | |
|---|---|
| Shanell James, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil No. 1:06CV00562 |
| ) | |
| U.S. Customs and Border Protection ) | |
| ) | |
| Defendant. ) | |

## DECLARATION OF DOROTHY PULLO

I, DOROTHY PULLO, in accordance with the provisions of 28 U.S.C. § 1746, declare as follows:

1. I am currently the Acting Director, Facilities Division of the Office of Field Operations (OFO) at U.S. Customs and Border Protection (CBP). At the time when this Freedom of Information Act (FOIA) litigation was filed by Plaintiff, Shanell James, regarding his request for information under the FOIA, I was the Supervisory Program Analyst of the Freedom of Information Act (FOIA)/Privacy Act (PA) Branch, OFO, CBP. I worked in that capacity from April 2005 to May 18, 2007. During this period I was the official responsible for the overall supervision and management of the processing of FOIA requests for records contained in CBP record systems, including CBP's database of information on the inspection of individuals at the border, as recorded in the Treasury Enforcement Communications System (TECS). I have been with CBP (formerly the U.S. Customs Service) for the past 26 years.

2. My statements are based upon my personal knowledge and information furnished to me in my official capacity as the Supervisory Program Analyst of the FOIA/PA Branch within OFO, and my review of the record systems kept in the ordinary course of business by CBP.

3. U.S. Customs and Border Protection is the unified border protection component within the Department of Homeland Security (DHS), which combines the immigration, customs and agricultural border inspection functions within DHS. CBP is charged with the management, control and protection of our Nation's borders at and between the official ports of entry.

4. CBP is organized into a number of functional offices. Within CBP, the FOIA program at the initial stage is decentralized, which means that each office

processes its own records. Accordingly, a FOIA request is likely to be processed more expeditiously if the FOIA requester addresses it directly to the Office that it believes will have possession of the records he seeks.

5. Plaintiff maintains that on February 22, 2005, he sent a FOIA request addressed directly to CBP Headquarters. See Plaintiff's Complaint. Plaintiff requested a Lab Analysis report "prepared by [CBP] . . . . in reference to . . . . Criminal Case No. 03-20452-CR . . . . [and] any additional records or documents in relation to [the] case. Including any audio, video, or photographs of surveillance in the above case. Date of Arrest 05/28/03, Arresting Agency (I.C.E.)."[1]

6. Because plaintiff was initially stopped by CBP, a search was conducted of the Treasury Enforcement Communications System (TECS) for any and all records concerning the plaintiff. TECS is a centralized database through which CBP Officers access various law enforcement agencies' information, as well as information regarding violations of the customs, immigration and agriculture laws and regulations of the United States. TECS is the system that CBP Officers at ports of entry use when travelers present themselves for entry into the United States. It is also the system used to record all "secondary inspections" of travelers.[2] On May 25, 2003, the Plaintiff was selected for secondary inspection upon arrival at Miami International Airport. TECS is the sole interface to Federal, State and local agency information used to assist CBP officers encountering travelers at the border. As such, a search of TECS would be reasonably calculated to uncover all relevant CBP records relating to Plaintiff.

7. On June 23, 2006, in response to Plaintiff's lawsuit, CBP conducted a search of TECS, and found two (2) pages of documents responsive to Plaintiff's FOIA request. See Exhibits E and F attached to Defendant's Motion for Summary Judgment. CBP disclosed the documents to Plaintiff in part, redacting certain information pursuant to FOIA exemptions 2, 6 and 7(C). On September 8, 2006, CBP filed a Motion for Summary Judgment and the Court issued its opinion and order on February 23, 2007, denying the Motion without prejudice.

---

[1] Immigration and Customs Enforcement (ICE) is another component of DHS. In addition, Plaintiff indicates his date of arrest as May 28, 2003. However, he was arrested on May 25, 2003.

[2] A "secondary inspection" is a border examination that goes beyond initial CBP questioning, which is conducted to ensure compliance with customs, agriculture and immigration requirements, and that no harm would be posed by the individual's entry into the United States. It is conducted in a separate area from the place of initial CBP processing, and can include: a more detailed examination of required travel and entry documents; a search of a vehicle; a search of the person; and/or the examination of baggage.

2

8. In response to the Court's memorandum opinion and order issued on February 23, 2007, I re-examined the two (2) pages of documents that had been retrieved from TECS and discovered a notation within those documents regarding a seizure. As a result, I contacted the Office of Fines, Penalties and Forfeiture (FP&F), within CBP's Miami Field Office to determine whether a seizure report or any additional records or information existed and could be located with respect to the incident.

9. In response to that contact, my office received fifty-five (55) documents relating to narcotics and personal items recovered and seized from the Plaintiff at the time of his secondary inspection at the Miami International Airport. These records have been released, in redacted form, to the Plaintiff. Therefore, CBP has released to Plaintiff any and all releasable information it has in its possession that is responsive to Plaintiff's FOIA request.

10. Plaintiff's original request to CBP included a request for the "Lab Analysis Report," which he indicates was prepared by CBP. However, CBP does not prepare such reports, and, as a matter of course, would not receive copies of such records. Therefore, no such report was found by CBP and no "lab analysis report" is included among the fifty-five (55) documents released to the Plaintiff.

11. ICE was the arresting law enforcement agency in this case and upon my review of the CBP file, I discovered notations that Plaintiff's FOIA request had been previously forwarded by CBP to ICE on July 27, 2005 for review and determination on the release of documents and/or information to the Plaintiff. As the arresting agency, ICE may have received lab analysis reports and other records relating to the narcotics seized from the Plaintiff. In addition, ICE, along with the prosecuting government agency, would likely maintain any additional records that accumulated as the case progressed through the criminal system.

12. As mentioned in paragraph 9, fifty-five (55) responsive documents were located by CBP in response to Plaintiff's original FOIA request. These documents were sent in redacted form to Plaintiff on or about July 11, 2007.[3] The following FOIA exemptions were used to redact information contained in these records: 5 U.S.C. §§ 552(b) (2); (b) (6); (b) (7) (C); (b) (7) (E).

---

[3] CBP initially released the fifty-five (55) documents, by mail, to the Plaintiff on or about June 28, 2007, however, the package was "returned to sender." Based upon information contained in the New York Department of Corrections, Bureau of Prisons website, CBP re-sent the documents to Plaintiff's correct address on or about July 11, 2007.

## EXEMPTIONS

13. Section 552(b) (2) of Title 5 of the U.S. Code exempts from mandatory disclosure matters that are "related solely to the internal personnel rules and practices of an agency." Exemption (b) (2) encompasses two distinct categories of information: (a) internal matters of a relatively trivial nature, sometimes referred to as "low 2" information, and (b) more substantial internal matters the disclosure of which would risk circumvention of a legal requirement, sometimes referred to as "high 2" information. With respect to "high 2" information, the intent of exemption (b) (2) is that disclosure should not benefit those attempting to violate the law and avoid detection. The use of Exemption (b) (2) in this case involves both "low 2" and "high 2" information.

14. The "low 2" information withheld pursuant to Exemption (b) (2) consists of phone numbers, facsimile numbers, administrative markings (e.g., file numbers, log numbers, record identification numbers, etc.) relating to internal agency file control systems, administrative codes and computer codes (e.g., access codes, function codes, windows-based access screens or "drop-down" lists, etc.) of internal agency information systems. These markings are purely internal and are utilized by CBP to assist in the management and control of its mission. As access to the filing and computer systems is restricted from the public, the public has little or no interest in this information or the file markings and computer codes. In addition, knowledge of internal agency computer system codes could facilitate improper access to sensitive CBP records and interfere with CBP's ability to maintain control of its information systems.

15. The following types of information were redacted from these documents under "low 2:" reference numbers, computer codes, codes and abbreviations referencing identity of CBP offices, agency codes, and fax numbers.

16. The "high 2" information withheld pursuant to Exemption (b) (2) is predominantly internal and does not impact, in any substantive manner, upon Plaintiff. This "high 2" information consists of such things as the administrative procedures related to the handling of inadmissible aliens (e.g., incident numbers, investigatory record numbers, etc.), the names of units that are activated in response to certain types of incidents, the consultation process within CBP (e.g., internal notification procedures, internal consultation procedures, etc.), the notification or consultation process with other law enforcement agencies, and the procedures related to how information was handled in an operational context by CBP officers. Disclosure of this information to the public would reveal procedures, guidelines, and techniques utilized by the agency in its enforcement operations, thereby benefiting those attempting to violate the law and avoid detection. Public awareness of specific operational information would aid those

who seek to circumvent CBP operations and thus harm the agency's effective conduct of its mission.

17. The following types of information were redacted from these documents under "high 2:" reference numbers, procedures related to how information was handled in an operational context by CBP officers, and information relating to the internal procedures of the agency.

18. Section 552 (b) (6) and (7) (C) of Title 5 of the U.S. Code exempts from mandatory disclosure records or information compiled for law enforcement purposes the disclosure of which could reasonably be expected to constitute an unwarranted invasion of personal privacy. These exemptions protect, among other types of information, the identity of law enforcement personnel and third parties referenced in files compiled for law enforcement purposes. The exemption is intended to protect law enforcement personnel from harassment and annoyance in their private lives due to the conduct of their official duties, which could conceivably result from public disclosure of their identity. The exemptions are also intended to protect third parties whose identities are revealed in law enforcement files from comment, speculation and any stigmatizing connotation associated with being identified in a law enforcement record.

19. In asserting these exemptions, each piece of information was scrutinized to determine the nature and strength of any individual's privacy interest in protecting the information, as balanced against the public's interest in disclosure. In each instance, it was determined that whatever public interest there might be, if any, in knowing the names of the individuals identified in the relevant records, that interest did not outweigh the privacy interests of said individuals.

20. In this case, Exemptions (b) (6) and (b) (7) (C) have been applied to the names and other personal identifying information associated with CBP officers, government personnel, and third parties who were mentioned in the documents.

21. Section 552(b) (7) (E) of Title 5 of the U.S. Code exempts from mandatory disclosure "...records or information compiled for law enforcement purposes...[which] would divulge techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law."

22. Investigative techniques and procedures are subject to "categorical" protection when their disclosure would risk the circumvention of laws and regulations, impede effectiveness of law enforcement activities or associations, and endanger investigatory practices and techniques. Even commonly known techniques and procedures may be protected where the circumstances of their usefulness are not

widely known. Disclosure of the information withheld pursuant to this exemption would advise violators or potential violators of CBP's law enforcement practices, procedures and techniques, thereby enabling them to circumvent the law, avoid detection and evade apprehension.

23. In this case, Exemption (b) (7) (E) has been applied to information concerning law enforcement investigative techniques and procedures. The type of information redacted relates to the type of examination conducted on the Plaintiff during his secondary inspection at the Miami International Airport, and the results of that examination.

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my information, knowledge and belief.

Executed this /3 of August, 2007.

Dorothy Pullo
Former Supervisory Program Analyst
FOIA/PA Branch
Office of Field Operations
U.S. Customs and Border Protection
Washington, D.C.